1
2
3
4
5
6
7

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MICHAEL IBARRA, | Case No. CV 15-8460 AG (AFM) |
| Petitioner, | |
| v. | **FINAL REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE** |
| RAYMOND MADDEN, Warden, | |
| Respondent. | |

This Final Report and Recommendation is submitted to the Honorable Andrew J. Guilford, United States District Judge, pursuant to the provisions of 28 U.S.C. § 636 and General Order 05-07 of the United States District Court for the Central District of California.

## INTRODUCTION

On October 29, 2015, petitioner filed, through counsel, a Petition for Writ of Habeas Corpus by a Person in State Custody (28 U.S.C. § 2254). The operative pleading is the First Amended Petition, which petitioner filed on March 31, 2016.

The First Amended Petition raises six grounds for federal habeas relief, directed to petitioner's convictions of attempted murder and shooting at an

occupied motor vehicle.  Petitioner's convictions are based on his participation in a shooting that was directed at two plainclothes police officers.

For the reasons discussed below, the Court recommends that the First Amended Petition be denied and that this action be dismissed with prejudice.

## PROCEDURAL HISTORY

On March 7, 2013, a Los Angeles County Superior Court jury convicted petitioner of two counts of premeditated attempted murder and one count of shooting at an occupied motor vehicle, and found true allegations of gang affiliation.  Petitioner's co-defendant, Armando Robles, also was convicted of multiple crimes. Petitioner was sentenced to state prison for life with the possibility of parole after 30 years.  (8 Reporter's Transcript ["RT"] 4504-14, 6322-26; 3 Clerk's Transcript ["CT"] 522-31, 598.)

Petitioner appealed.  (Respondent's notice of lodging, Lodgments 3, 6.)  In an unpublished decision issued on February 26, 2015, and with a minor modification on March 12, 2015, the California Court of Appeal affirmed the judgment. (Lodgments 8, 12.)  Petitioner then filed a petition for rehearing, which the California Court of Appeal denied.  (Lodgments 13, 14.)  On June 24, 2015, the California Supreme Court summarily denied petitioner's and Robles's Petitions for Review.  (Lodgments 9-11.)

Petitioner filed the instant action on October 29, 2015.  Petitioner's initial Petition raised seven grounds for federal habeas relief.

Respondent filed a Motion to Dismiss the Petition because Ground Seven — ineffective assistance of counsel for failure to raise an Eighth Amendment objection during trial — was unexhausted.  The Court issued a Report and Recommendation in which it recommended that the Motion be granted unless petitioner withdrew Ground Seven or requested that the Petition be stayed while petitioner returned to state court to exhaust it.

On March 31, 2016, petitioner filed a First Amended Petition which deleted Ground Seven.  The Court vacated its Report and Recommendation and ordered briefing on the merits.  Respondent filed an Answer to the First Amended Petition on May 4, 2016.  Petitioner filed a Reply on August 6, 2016.

## SUMMARY OF THE TRIAL EVIDENCE

Based on its independent review of the record, the Court adopts the following summary from the California Court of Appeal's opinion as a fair and accurate summary of the evidence presented at trial.  (Lodgment 8 at 3-7.)

### 1.   Prosecution's Case

#### a.   The Shooting

Los Angeles Police Department Officers Benjamin Aguilera and Cesar Wences were working for the vice unit on September 27, 2011.  They wore plain clothes and rode in a late model, rented black Camaro.  Wences was driving, and Aguilera sat in the front passenger seat.  They were driving northbound on Soto Street north of Cesar Chavez Avenue, a known gang area, when they heard someone yelling from the west sidewalk or a front porch by the sidewalk.  They saw a man, whom they later identified as Robles, looking at them and yelling while gesturing with his hands.  They could not make out the words spoken or the gestures, but Wences perceived the gestures to be gang signs.

Wences saw approximately four males standing on the porch.  He saw Robles step onto the sidewalk while reaching toward his rear waistband.  Robles then walked northbound on the sidewalk in the same direction as the moving car.  [Petitioner] followed behind him.

Wences turned left from Soto Street to Sheridan Street and drove slowly westbound on Sheridan Street. Robles and [petitioner]

followed briskly on foot and crossed over to the north side of Sheridan Street.  Aguilera saw that Robles was carrying a handgun in his right hand, informed his partner, and broadcast a call for help on his police radio.  Noticing that Aguilera's call was being interrupted by other transmissions, Wences pressed the help button on his own police radio to override the other calls, reported a man with a gun, and requested backup.

Wences then saw Robles enter the front passenger side of a silver car behind the Camaro facing west on Sheridan Street.  Aguilera saw both defendants enter the silver car.  The silver car accelerated, as did Wences.  Wences drove approximately 40 to 50 miles per hour.  The silver car was approximately 500 feet behind the Camaro.  Wences sought to maintain a safe distance between the two vehicles while continuing to monitor the suspects' location so as to assist the officers responding to his call.  Following a jog in the road, he turned right onto St. Louis Street and then left back onto Sheridan Street.  The officers continued westbound on Sheridan Street to its terminus at State Street, and turned left onto State Street.  As he turned onto State Street, Wences saw the silver car turning left from St. Louis Street onto Sheridan Street.

Wences pulled over to the shoulder of State Street near a freeway overpass to see whether the silver car would continue to follow them.  After a short time, the silver car turned left onto State Street.  Wences sped away with the silver car in pursuit.  Wences drove south on State Street to Cesar Chavez Avenue where he stopped at a red light and then ran the red light as the silver car continued approaching.  As Wences continued driving south on State Street, the silver car turned right onto Cesar Chavez Avenue, traveling west.

4

Wences then made a u-turn, so the Camaro was facing north on State Street south of Cesar Chavez Avenue.  As he completed the u-turn, the two officers saw the silver car turn right onto State Street from Cesar Chavez Avenue.  The two cars were now facing each other and were only about 60 feet apart with no outlet between them. Wences almost came to a stop momentarily, and then unholstered his handgun and drove forward.  Aguilera also unholstered his handgun and held it by his leg.

Wences saw Robles lean in front of the driver and point a gun in his right hand out the driver's side window and toward the officers while the driver leaned back in the driver's seat.  The two cars were only 10 to 15 feet apart at this time.  Aguilera also saw the front passenger holding a gun in his right hand extending his right arm out the driver's side window.  The officers saw a muzzle flash and heard a shot.  Aguilera ducked down by the dashboard, while Wences, holding a gun in his right hand and extending the gun out the driver's side window, fired three shots toward the silver car.  Wences could not recall who fired first, but Aguilera testified that he heard the first shot from the silver car.  The two cars drove past each other traveling in opposite directions.

The silver car continued traveling southbound on State Street. Wences made a u-turn and saw the silver car turn left onto Michigan Avenue.  Wences also turned from State Street left onto Michigan Avenue and saw the silver car turn right at the next street.  The first marked patrol car arrived soon afterwards.

The silver car stopped shortly after turning right.  Robles and [petitioner] ran from the car.  [Petitioner] was holding a semiautomatic handgun in his right hand pointed toward the ground.  Police officers

in a marked patrol car drove toward the two suspects, who ran down the driveway of an apartment complex.  Officer Gabriel Blanco drew his gun and shouted at the defendants, but they kept running.  The officers set up a perimeter and waited for other officers to arrive.  Officer Peter Bueno saw the defendants standing next to a garage.  He ordered them out towards the front and, with the assistance of other officers, arrested them.

Meanwhile, the silver car fled the scene.  Officers later pursued the car and arrested the driver, Alex Miranda.

The police discovered a handgun under or on a plastic tarp in the parking lot behind the apartment building.   They found another handgun in a stack of plastic chairs.  The two handguns were a .357 caliber Magnum revolver and a .45 caliber Taurus semiautomatic pistol.  The revolver was fully loaded with ammunition, the hammer was cocked, and there was a bullet in the chamber ready to fire.  The Taurus held 10 rounds in the magazine and one in the chamber.  The magazine had a capacity of 12 rounds.  Both guns had been fired at some time, although the criminalists could not determine when they were fired.

A .45 caliber fired bullet was found in the front left wheel well of the Camaro.  It could have been fired from the Taurus and was not fired from the revolver.  The bullet impacts indicated that it was fired from in front of and toward the Camaro and moved from the driver's side toward the passenger's side.  Another set of bullet impacts found on the Camaro's driver's side mirror indicated that another bullet was fired from the Camaro away from the vehicle and struck the mirror.  The results of gunshot residue tests for both defendants were negative.

A witness testified at trial that she was having a yard sale in

front of her house on State Street on the evening of September 27, 2011, when she heard a gunshot. She ran to her porch, turned, and saw a bald-headed man in a black car with his arm outstretched pointing a gun out the window. She saw other cars ahead of the black car, but she did not notice a silver car. She believed that the black car was traveling south on State Street. When asked if the black car was following another car, she responded that it was and stated, "[t]here were other cars in front." She could not tell whether the gun was pointed at another car. She testified that she heard two more shots "further down," perhaps two or three streets away.[fn]

> [fn]   The same witness stated when she was interviewed by the police on September 27, 2011, that she initially heard two gunshots, ran toward the house, turned, and saw a black car with the driver extending his arm out the window and holding a gun. She stated that the black car was driving south on State Street behind another car and that she heard no more gunshots. The prosecutor played a recording of the interview at trial and provided transcripts to the jurors.

### b.    Gang Evidence

Los Angeles Police Department Officer Brian Jones testified for the prosecution as a gang expert. He was assigned to the gang enforcement detail in the Hollenbeck Division. He stated that gang members commit violent crimes to instill fear and intimidation in the community and to enhance their reputation within the gang. He stated that gangs are territorial, and gang members typically react very

aggressively when rivals enter their territory.  Gang members may challenge an unfamiliar individual by gesturing a gang sign or stating their gang's name and then gauging the person's reaction.  Gang members may commit violence and shootings if they perceive a violation of their territory.

Jones testified that he was familiar with Robles and that Robles was a known member of the State Street gang displaying multiple gang tattoos.  He stated that [petitioner] was also a known member, or at least an associate, of the gang and that Miranda was a known State Street gang member displaying gang tattoos.

### 2.    Defense Case

The defense called Dr. Bruce Krell to testify as an expert regarding the bullet trajectories.  Dr. Krell had performed a reconstruction of the shooting.  He concluded that the passenger in the silver car did not have enough room to lean across the driver as the officers described and that the muzzle blast from firing the gun would have burned the driver's face.  Dr. Krell stated that the impact height and bullet trajectory were inconsistent with the officers' explanation of the shooting and that it was more likely that the driver of the silver car was the shooter.

The defense also called the officers' supervisor, Sergeant Marc Archuleta, who arrived at the scene of the shooting shortly after the incident.   He interviewed Aguilera and Wences that evening. Archuleta testified that Wences told him that he was parked in the car when he fired the shots.[fn]  Wences also stated that he might have seen a woman in the silver car.

1        [fn]   At trial, Wences denied stating that he was

2       parked at the time he fired the shots.

3     Robles and [petitioner] did not testify at trial.

4

5                     **PETITIONER'S CLAIMS**

6     1.     The trial evidence was insufficient to support petitioner's convictions

7 of premeditated attempted murder.  (First Amended Petition ["FAP"] at 5; Reply at

8 4-12.)

9     2.     The trial evidence was insufficient to support petitioner's conviction of

10 shooting an occupied motor vehicle.  (FAP at 5-6; Reply at 12-13.)

11     3.     The trial court's refusal to instruct the jury on voluntary manslaughter

12 and self-defense violated petitioner's constitutional rights to due process, jury trial,

13 and presentation of a defense.  (FAP at 6; Reply at 13-24.)

14     4.     The trial court misapplied state sentencing law by imposing a 15-year

15 minimum parole eligibility period for each count of attempted murder.  (FAP at 6;

16 Reply at 25-28.)

17     5.     The trial court misunderstood its sentencing discretion in imposing the

18 15-year minimum parole eligibility period for each count of attempted murder.

19 (FAP Attachment A at 4.)

20     6.     Petitioner's sentence of life with the possibility of parole after 30 years

21 violates the Eighth Amendment's prohibition against cruel and unusual punishment.

22 (FAP Attachment A at 5; Reply at 28-33.)

23

24                     **STANDARD OF REVIEW**

25     Under 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective

26 Death Penalty Act of 1996 ("AEDPA"):

27     "An application for a writ of habeas corpus on behalf of a person in

28     custody pursuant to the judgment of a State court shall not be granted

with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

Under the AEDPA, the "clearly established Federal law" that controls federal habeas review of state court decisions consists of holdings (as opposed to dicta) of Supreme Court decisions "as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *see also Carey v. Musladin*, 549 U.S. 70, 74 (2006).

Although a particular state court decision may be both "contrary to" and "an unreasonable application of" controlling Supreme Court law, the two phrases have distinct meanings. *See Williams*, 529 U.S. at 391, 413. A state court decision is "contrary to" clearly established federal law if the decision either applies a rule that contradicts the governing Supreme Court law, or reaches a result that differs from the result the Supreme Court reached on "materially indistinguishable" facts. *See Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam); *Williams*, 529 U.S. at 405-06. When a state court decision adjudicating a claim is contrary to controlling Supreme Court law, the reviewing federal habeas court is "unconstrained by § 2254(d)(1)." *See Williams*, 529 U.S. at 406. However, the state court need not cite or even be aware of the controlling Supreme Court cases, "so long as neither the reasoning nor the result of the state-court decision contradicts them." *See Early*, 537 U.S. at 8.

State court decisions that are not "contrary to" Supreme Court law may be set aside on federal habeas review only "if they are not merely erroneous, but 'an *unreasonable* application' of clearly established federal law, or based on 'an *unreasonable* determination of the facts.'" *See Early*, 537 U.S. at 11 (citing 28

U.S.C. § 2254(d)) (emphasis added). A state-court decision that correctly identified the governing legal rule may be rejected if it unreasonably applied the rule to the facts of a particular case. *See Williams*, 529 U.S. at 406-10, 413 (*e.g.*, the rejected decision may state the *Strickland* standard correctly but apply it unreasonably); *Woodford v. Visciotti*, 537 U.S. 19, 24-27 (2002) (per curiam). However, to obtain federal habeas relief for such an "unreasonable application," a petitioner must show that the state court's application of Supreme Court law was "objectively unreasonable." *Visciotti*, 537 U.S. at 24-27; *Williams*, 529 U.S. at 413. An "unreasonable application" is different from an erroneous or incorrect one. *See Williams*, 529 U.S. at 409-10; *Visciotti*, 537 U.S. at 25; *Bell v. Cone*, 535 U.S. 685, 699 (2002). Moreover, review of state court decisions under § 2254(d)(1) "is limited to the record that was before the state court that adjudicated the claim on the merits." *See Cullen v. Pinholster*, 563 U.S. 170, 180 (2011).

As the Supreme Court explained in *Harrington v. Richter*, 562 U.S. 86, 102 (2011):

> "Under § 2254(d), a habeas court must determine what arguments or theories supported or, as here [i.e., where there was no reasoned state-court decision], could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court."

Furthermore, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103.

Here, petitioner's claims were raised on direct appeal in the California Court of Appeal, which affirmed the judgment in a reasoned decision. The claims then

were presented in his Petition for Review, which the California Supreme Court summarily denied.  Thus, the California Court of Appeal's decision on direct appeal constitutes the relevant state court adjudication on the merits for purposes of the AEDPA standard of review.  *See Berghuis v. Thompkins*, 560 U.S. 370, 380 (2010) (where state supreme court denied discretionary review of decision on direct appeal, the decision on direct appeal is the relevant state court decision for purposes of the AEDPA standard of review).

## DISCUSSION

### A.   Ground Seven of the initial Petition was unexhausted.

As an initial matter, it is necessary to explain briefly why the Court earlier found Ground Seven of the initial Petition was unexhausted, leading petitioner to withdraw the claim without requesting that the Petition be stayed.  In Ground Seven, petitioner had claimed that his counsel was ineffective for failing to argue at trial that petitioner's sentence of life with the possibility of parole after 30 years violated the Eighth Amendment.  (ECF No. 9 at 5-6.)

Exhaustion requires that the prisoner's contentions be fairly presented to the state courts and be disposed of on the merits by the highest court of the state.  *See James v. Borg*, 24 F.3d 20, 24 (9th Cir. 1994); *Carothers v. Rhay*, 594 F.2d 225, 228 (9th Cir. 1979).  This requirement is not satisfied when a petitioner submits a claim to the state's highest court in a procedural context in which the claim will not be considered on the merits.  *See Roettgen v. Copeland*, 33 F.3d 36, 38 (9th Cir. 1994) (*citing Castille v. Peoples*, 489 U.S. 346, 351 (1989)).

Petitioner raised Ground Seven in the California courts in a procedural context in which it would not have been considered on the merits because he raised it for the first time in a petition for rehearing in the California Court of Appeal, after it had already issued its decision on direct appeal.  (Lodgment 13 at 15-18.)  The California courts generally will not consider an issue that is raised for the first time

in a petition for rehearing. *See People v. Holford*, 203 Cal. App. 4th 155, 159 n.2 (2012) ("[I]t is too late to urge a point for the first time in a petition for rehearing, after the case has been fully considered and decided by the court upon the points presented in the original briefs.") (citing cases); *see also Prince v. Hill*, 170 Cal. 192, 195 (1915) (same).

Petitioner next raised Ground Seven in the state courts for the second and final time in his Petition for Review in the California Supreme Court, but this also failed to satisfy the exhaustion requirement. (Lodgment 9 at 24-27.)  On a petition for review, the California Supreme Court generally will not consider any issue that could have been but was not timely raised in the appellate briefs filed in the Court of Appeal. *See People v. Bland*, 28 Cal. 4th 313, 336 n.10 (2002); *see also Cooley v. Superior Court*, 29 Cal. 4th 228, 250 and n.11 (2002) (California Supreme Court generally will decline to consider an issue raised for the first time in a petition for rehearing in the California Court of Appeal).

In narrow circumstances, the California courts may consider issues raised for the first time in this context.  An issue raised for the first time in a petition for rehearing may be considered if the case involves the death penalty. *See People v. Malone*, 205 Cal. 29, 32-33 (1928).  An issue raised for the first time in a petition for review may be considered if it involves a pure question of law, not turning upon disputed facts, and was pertinent to a proper disposition of the case or involved matters of particular public importance. *See People v. Randle*, 35 Cal. 4th 987, 996-97 (2005), *overruled on other grounds by People v. Chun*, 45 Cal. 4th 1172, 1197-1201 (2009).  None of these circumstances existed here.

Indeed, the California Court of Appeal and the California Supreme Court gave no indication that Ground Seven was considered on the merits at all, but rather summarily denied the petition for rehearing and the petition for review, respectively.  The state courts' summary denials were not adjudications on the merits for purposes of the exhaustion requirement. *See Cannedy v. Adams*, 706

F.3d 1148, 1158 (9th Cir. 2013) (state court's summary denial of discretionary review is not a decision on the merits).

Finally, if it were clear that petitioner's claim was procedurally barred under state law, then the exhaustion requirement would have been satisfied. *See Castille*, 489 U.S. at 351-52; *Johnson v. Zenon*, 88 F.3d 828, 831 (9th Cir. 1996); *Jennison v. Goldsmith*, 940 F.2d 1308, 1312 (9th Cir. 1991). However, it was not "clear" here that the California Supreme Court would hold that Ground Seven was procedurally barred under state law, if petitioner were to raise it in a habeas petition to the California Supreme Court (which being an original proceeding is not subject to the same timeliness requirement as a petition for review of a Court of Appeal decision). *See, e.g., In re Harris*, 5 Cal. 4th 813, 825 (1993) (granting habeas relief where petitioner claiming sentencing error, even though the alleged sentencing error could have been raised on direct appeal); *In re Clark*, 5 Cal. 4th 750, 765 (1993) (allowing review of untimely claims if petitioner can "explain and justify" the delay); *People v. Sorensen*, 111 Cal. App. 2d 404, 405 (1952) (noting that claims that fundamental constitutional rights have been violated may be raised by state habeas petition).

In sum, Ground Seven of the initial Petition was unexhausted.

**B.**   **Habeas relief is not warranted with respect to petitioner's insufficiency-of-the-evidence claims (Grounds One and Two).**

In Grounds One and Two, petitioner claims that the trial evidence was insufficient to support his convictions of premeditated attempted murder and shooting at an inhabited motor vehicle.

**1.**   **Legal standard.**

The Due Process Clause of the Fourteenth Amendment protects a criminal defendant from conviction "except upon proof beyond a reasonable doubt of every

14

fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970); *accord Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005).  Thus, a state prisoner who alleges that the evidence introduced at trial was insufficient to support the jury's findings states a cognizable federal habeas claim. *See Herrera v. Collins*, 506 U.S. 390, 401-02 (1993).  But the prisoner faces a "heavy burden" to prevail on such a claim.  *See Juan H.*, 408 F.3d at 1274, 1275 n.13.  Under *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (italics in original), the question is whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

When determining the sufficiency of the evidence, a reviewing court makes no determination of the facts in the ordinary sense of resolving factual disputes. *See Sarausad v. Porter*, 479 F.3d 671, 678 (9th Cir.), *vacated in part*, 503 F.3d 822 (9th Cir. 2007), *rev'd on other grds*, 555 U.S. 179 (2009).  Rather, the reviewing court "must respect the province of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts by assuming that the jury resolved all conflicts in a manner that supports the verdict."  *See Walters v. Maass*, 45 F.3d 1355, 1358 (9th Cir. 1995); *see also Jackson*, 443 U.S. at 319, 324, 326.  Thus, in determining the sufficiency of the evidence, "the assessment of the credibility of witnesses is generally beyond the scope of review."  *See Schlup v. Delo*, 513 U.S. 298, 330 (1995); *see also United States v. Lindsey*, 634 F.3d 541, 552 (9th Cir. 2011); *Bruce v. Terhune*, 376 F.3d 950, 957 (9th Cir. 2004) ("A jury's credibility determinations are . . . entitled to near-total deference under *Jackson*.").

Moreover, while "'mere suspicion or speculation cannot be the basis for the creation of logical inferences,'" *see Maass*, 45 F.3d at 1358 (citation omitted), "'[c]ircumstantial evidence can be used to prove any fact, including facts from which another fact is to be inferred, and is not to be distinguished from testimonial evidence insofar as the jury's fact-finding function is concerned,'" *Payne v. Borg*,

982 F.2d 335, 339 (9th Cir. 1992) (citation omitted).  Furthermore, "to establish sufficient evidence, the prosecution need not affirmatively 'rule out every hypothesis except that of guilt.'"  *Schell v. Witek*, 218 F.3d 1017, 1023 (9th Cir. 2000) (en banc) (*quoting Wright v. West*, 505 U.S. 277, 296 (1992) (plurality opinion)).

In post-AEDPA cases, where, as here, a state court has issued a reasoned decision rejecting a claim of insufficient evidence under a standard that is not "contrary to" *Jackson*, a reviewing federal court applies an additional layer of deference.  *See Juan H.*, 408 F.3d at 1274.  A federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees; rather, it "may do so only if the state court decision was 'objectively unreasonable.'"  *Cavazos v. Smith*, __ U.S. __, 132 S. Ct. 2, 4 (2011) (per curiam); *see also Juan H.*, 408 F.3d at 1275 n.13.  This "double dose of deference . . . can rarely be surmounted."  *See Boyer v. Belleque*, 659 F.3d 957, 964 (9th Cir. 2011); *see also Coleman v. Johnson*, __ U.S. __, 132 S. Ct. 2060, 2062 (2012) (per curiam) ("We have made clear that *Jackson* claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference.").

Thus, a state court's resolution of an insufficiency of the evidence claim is evaluated under 28 U.S.C. § 2254(d)(1), not § 2254(d)(2).  *See Emery v. Clark*, 643 F.3d 1210, 1213-14 (9th Cir. 2011) ("When we undertake collateral review of a state court decision rejecting a claim of insufficiency of the evidence pursuant to 28 U.S.C. § 2254(d)(1), . . . we ask only whether the state court's decision was contrary to or reflected an unreasonable application of *Jackson* to the facts of a particular case."); *see also Long v. Johnson*, 736 F.3d 891, 896 (9th Cir. 2013) ("The pivotal question, then, is whether the California Court of Appeal . . . unreasonably applied *Jackson* in affirming Petitioner's conviction for second-degree murder."); *Boyer*, 659 F.3d at 965 ("[T]he state court's application of the

*Jackson* standard must be 'objectively unreasonable' to warrant habeas relief for a state court prisoner."); *Juan H.*, 408 F.3d at 1275 ("[W]e must ask whether the decision of the California Court of Appeal reflected an 'unreasonable application of' *Jackson* and *Winship* to the facts of this case.") (citing 28 U.S.C. § 2254(d)(1)); *Flores v. Beard*, 553 F. App'x 730, 731 n.1 (9th Cir. 2013) ("Because we 'evaluate a state court's resolution of a *Jackson* sufficiency-of-the-evidence claim in all cases under § 2254(d)(1) rather than § 2254(d)(2),' we do not address [petitioner]'s § 2254(d)(2) argument.") (*quoting Sarausad*, 479 F.3d at 678).

Finally, in adjudicating an insufficiency of the evidence claim, a federal habeas court "look[s] to [state] law only to establish the elements of [the crime] and then turn[s] to the federal question of whether the [state court] was objectively unreasonable in concluding that sufficient evidence supported [the conviction]." *See Juan H.*, 408 F.3d at 1278 n.14 (*citing Jackson*, 443 U.S. at 324 n.16); *Chein v. Shumsky*, 373 F.3d 978, 983 (9th Cir. 2004) (en banc) ("The *Jackson* standard must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law.") (internal quotation marks omitted).

### 2.    Premeditated attempted murder (Ground One).

The California Court of Appeal set out the following substantive elements of premeditated attempted murder, based on a theory of aiding and abetting (Lodgment 8 at 9-10):

> A person who unsuccessfully attempts to unlawfully kill another person with malice aforethought is guilty of the crime of attempted murder. (§§ 187, subd. (a), 664.) Attempted murder requires a specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing. (*People v. Hajek and Vo* (2014) 58 Cal. 4th 1144, 1192; § 21a.) Direct evidence of a defendant's intent to kill is rare. Such intent usually must be inferred from the

defendant's acts and the circumstances of the crime.  (*People v. Smith* (2005) 37 Cal. 4th 733, 741.)  The act of purposefully discharging a firearm at another person at close range, without legal excuse, supports an inference that the shooter had an intent to kill.  (*Id.* at p. 742, *see id.* at p. 739.)

A person may be guilty of attempted murder, or any other crime, as a direct perpetrator or as an aider and abettor.  (*People v. Lee* (2003) 31 Cal. 4th 613, 622 (*Lee* ).)  "'A person who aids and abets the commission of a crime is a "principal" in the crime, and thus shares the guilt of the actual perpetrator.' [Citation.]"  (*People v. Smith* (2014) 60 Cal. 4th 603, 611; see § 31.)  A person aids or abets the commission of a crime by aiding the direct perpetrator by acts or encouraging him or her by words or gestures.  (*Lee*, *supra*, at p. 623.) In addition, the aider and abettor must act with knowledge of the criminal purpose of the direct perpetrator and with the intent of committing or of encouraging or facilitating the commission of the crime.  (*Smith*, *supra*, at p. 611.)  "Thus, to be guilty of attempted murder as an aider and abettor, a person must give aid or encouragement with knowledge of the direct perpetrator's intent to kill and with the purpose of facilitating the direct perpetrator's accomplishment of the intended killing — which means that the person guilty of attempted murder as an aider and abettor must intend to kill. [Citation.]"  (*Lee*, *supra*, at p. 624.)

Section 664, subdivision (a) increases the punishment for attempted murder when the attempted murder was willful, deliberate, and premeditated. The statute increases the punishment both for the direct perpetrator who committed the attempted murder willfully, deliberately, and with premeditation, and for any aider and abettor who

did not personally act with willfulness, deliberation, and premeditation. (*People v. Favor* (2012) 54 Cal. 4th 868, 879; *Lee*, *supra*, 31 Cal. 4th at p. 627.)

Petitioner was convicted of two counts of premeditated attempted murder, under a theory of aiding and abetting, because it was undisputed that he was not the actual shooter. According to the trial evidence, the actual shooter was either Armando Robles (petitioner's initial companion) or Alex Miranda (the driver of the silver car). The crux of petitioner's argument, which presumes that Miranda was the actual shooter, is that no evidence showed that petitioner helped Miranda commit the shooting because petitioner's interaction with Miranda was limited to getting into the silver car and sitting passively in the back seat.

In rejecting this argument, the California Court of Appeal found the evidence presented at trial was sufficient to establish that both petitioner and his co-defendant, Robles, aided and abetted the attempted murders, even if one assumes that the actual shooter was Miranda (Lodgment 8 at 11-12):

> We conclude that substantial evidence supports defendants' attempted murder convictions as aiders and abettors. That is, defendants' actions suggest that they knew of and shared the shooter's intent and that they provided aid and encouragement. Robles shouted and gestured at the officers, drew a gun, and pursued the Camaro on foot. [Petitioner] followed behind him. Defendants then entered the silver car and continued to pursue the Camaro through several turns. Although they turned right onto Cesar Chavez Avenue after the Camaro ran a red light driving south on State Street, they quickly turned back onto State Street and resumed driving south on State Street toward the Camaro. An occupant of the silver car then pointed a gun and shot toward the Camaro at close range. The fact that the Camaro was only 10 to 15 feet away from the silver car at the time of the

shooting supports an inference that the shooter intended to kill the officers.[fn]

> [fn]   The jury found the allegation that a principal personally and intentionally discharged a firearm in the commission of the attempted murders not true as to both defendants.   The jury also found the allegation that a principal personally used a firearm true as to Robles but not true as to [petitioner]. These findings appear to be inconsistent with the guilty verdicts against both defendants because the attempted murders involved the discharge of a firearm.   Such an inconsistency, however, does not undermine the guilty verdicts if substantial evidence supports the guilty verdicts.   (*People v. Miranda* (2011) 192 Cal. App. 4th 398, 405.)   "An inconsistency may show no more than jury lenity, compromise, or mistake, none of which undermines the validity of a verdict."  (*People v. Lewis* (2001) 25 Cal. 4th 610, 656.)

Robles's acts of shouting and gesturing at the officers were belligerent, especially when the acts were committed by a known gang member in gang territory.   His brandishing a gun while pursuing the Camaro on foot and then continuing to pursue the Camaro in the silver car also evidenced a malevolent intent.   [Petitioner's] acts of pursuing the Camaro on foot and then entering the silver car with Robles, knowing that Robles was acting belligerently toward the occupants of the Camaro and openly carrying a gun, suggest that he shared Robles's malevolent intent.   There is no indication that defendants were

unwilling participants in either the car chase or the shooting.  To the contrary, their conduct suggests that they were willing participants. Based on this evidence, the jury could reasonably conclude that defendants had knowledge of and shared the shooter's intent to pursue and kill the officers and gave aid and encouragement to the shooter.

Based on its independent review of the record, the Court concurs that the evidence presented at trial was sufficient for a reasonable jury to conclude that petitioner aided and abetted the attempted murders, without regard to whether the actual shooter was Robles or Miranda.  Under California law, mere presence at the scene of a crime is not sufficient to constitute aiding and abetting, nor is the failure to take action to prevent a crime, although these are factors the jury may consider. *People v. Garcia*, 168 Cal. App. 4th 261, 272-73 (2008).  The relevant factors include "presence at the scene of the crime, failure to take steps to attempt to prevent the commission of the crime, companionship, flight, and conduct before and after the crime."  *Garcia*, 168 Cal. App. 4th at 273 (*citing People v. Jones*, 108 Cal. App. 3d 9, 15 (1980)).

The evidence presented at trial reflected each of these factors.  Petitioner was present at the shooting and failed to take any steps to prevent it.  Rather, when petitioner first encountered the victims, he stood by while his companion, Robles, taunted the victims with gang signs.  (3 RT 948-49.)  Petitioner then pursued the victims on foot along with Robles, who at that point was visibly holding a handgun "out in front of him."  (3 RT 953-54, 956.)  From this evidence, a reasonable jury could conclude that petitioner knew before the shooting that Robles was armed and encouraged Robles in pursuing the victims.  And despite Robles's dangerous behavior, petitioner got into the silver car with him in order to continue pursuing the victims.  (3 RT 957-58.)

Even under petitioner's theory that the actual shooter was Alex Miranda, the evidence was sufficient to establish that petitioner had aided and abetted Miranda in

committing attempted murder.   Before he entered Miranda's car with Robles, petitioner knew that Robles had a gun which the three of them could use to pursue the victims.   While sitting in Miranda's car, petitioner took no steps to prevent the shooting.   And after the shooting, petitioner fled the scene with a "blue steel semi-automatic" handgun, which a reasonable jury could conclude was the gun used to shoot at the victims.   (4 RT 1579-80; 5 RT 2118, 2140, 2151-52.)   Petitioner's fingerprint also was found on a second gun (a revolver) that was discovered near an apartment complex where petitioner and Robles had fled to after the shooting. (6 RT 2429.)   Under California law, evidence of a defendant's flight from the crime scene with the weapon or other evidence is relevant to determine his liability for aiding and abetting the crime.   *See Garcia*, 168 Cal. App. 4th at 274 (flight from the scene with the murder weapon was relevant to aider and abettor liability).

Evidence also was presented that, after petitioner was caught by the police, he gave a false statement in which he denied any involvement in the shooting. (3 CT 457-62, 468-71; 6 RT 2448-50.)   The jury was instructed that if petitioner had made a false or misleading statement relating to the charges, it could be used to show his awareness of his guilt and could be considered in determining his guilt. (3 CT 498; 7 RT 3623-24.)

As the Court of Appeal noted, it makes no difference that the guilty verdict in this case may have been inconsistent with the jury's findings as to the firearm allegations.   Inconsistent verdicts afford no basis for federal habeas relief.   *See Ferriz v. Giurbino*, 543 F.3d 990, 992 (9th Cir. 2005) ("The Supreme Court has made it clear that inconsistent verdicts may stand when one of those verdicts is a conviction and the other an acquittal.") (*citing United States v. Powell*, 469 U.S. 57, 65 (1984), *and Dunn v. United States*, 284 U.S. 390, 393 (1932)).

The evidence presented at trial also was sufficient for a reasonable jury to conclude that the perpetrators committed the attempted murders with willfulness, deliberation, and premeditation.   Under California law, relevant types of evidence

are of (1) planning activity, (2) motive, and (3) manner of killing.  Verdicts will typically be sustained when there is evidence of all three types, or at least extremely strong evidence of (1), or evidence of (2) in conjunction with either (1) or (3).  *See People v. Anderson*, 70 Cal. 2d 15, 26-27 (1968); *People v. Welch*, 20 Cal. 4th 701, 758 (2000); *People v. Thomas*, 2 Cal. 4th 489, 516-17 (1992); *People v. Wharton*, 53 Cal. 3d 522, 546-47 (1991).

Here, planning activity reasonably could have been inferred from evidence that Robles openly displayed a gun "out in front of him" before he and petitioner entered the silver car.  (3 RT 953, 956.)  A reasonable jury also could infer that the motive for the shooting was that the victims, who did not belong to the State Street gang, had earlier traveled through the gang's territory.  (4 RT 1211; 6 RT 2715.)  And evidence of the manner of killing included testimony that the shooter attacked the victims on a street without side streets, and after the victims had earlier managed to get away from the silver car by running a red light.  (4 RT 1236, 1536.)  As the California Court of Appeal pointed out, it makes no difference as a matter of California law that petitioner, an aider and abettor, did not personally act with willfulness, deliberation, and premeditation.  *See Lee*, 31 Cal. 4th at 627.

In sum, the California Court of Appeal's rejection of this claim did not involve an unreasonable application of the *Jackson* standard.

### 3.      Shooting at an inhabited motor vehicle (Ground Two).

The California Court of Appeal set out the following substantive elements of shooting at an inhabited motor vehicle and found the evidence sufficient to establish that petitioner had aided and abetted the shooting (Lodgment 8 at 12):

> A person who maliciously and willfully discharges a firearm at an occupied motor vehicle is guilty of a crime.  (§ 246.)  Shooting at an occupied motor vehicle is a general intent crime.  (*People v. Mendoza* (1998) 18 Cal. 4th 1114, 1123 (*Mendoza*); *People v.*

*Overman* (2005) 126 Cal. App. 4th 1344, 1356.)  The act of shooting at an occupied motor vehicle is inherently criminal, so the direct perpetrator need not have any other intent apart from the intent to commit that act. (*Mendoza*, *supra*, at pp. 1123, 1129.)

A person is guilty of shooting at an occupied motor vehicle as an aider and abettor only if he or she gives aid or encouragement with the specific intent that the direct perpetrator commit the crime. (*Mendoza*, *supra*, 18 Cal. 4th at p. 1129.)  The attempted murders here were perpetrated by shooting at an occupied vehicle.  The same evidence discussed above showing that defendants gave aid and encouragement for the attempted murders by entering the silver car and pursuing the Camaro together also shows that defendants gave aid and encouragement for the shooting at an occupied vehicle. Accordingly, sufficient evidence supports defendants' convictions of discharging a firearm at an occupied vehicle.

Based on its independent review of the record, the Court concurs that the evidence presented at trial was sufficient for a reasonable jury to conclude that petitioner had aided and abetted the shooting at an occupied vehicle.  As discussed above, after following the victims' car on foot, petitioner entered another car with his co-defendant — who was visibly carrying a gun and was belligerent toward the victims — in order to continue a pursuit of the victims that led to the shooting.  And after the shooting, petitioner fled the scene with a gun that was consistent with the gun used to shoot at the victims' Camaro.  The California Court of Appeal's rejection of this claim therefore did not involve an unreasonable application of the *Jackson* standard.

///

///

///

**C.     Habeas relief is not warranted with respect to petitioner's instructional-error claim (Ground Three).**

In Ground Three, petitioner claims that his constitutional rights were violated by the trial court's refusal of his request to instruct the jury on (1) the lesser-included offense of attempted voluntary manslaughter and (2) self-defense.  (FAP at 6; Reply at 13-24.)

**1.     The first part of this claim arguably is barred by the *Teague* doctrine.**

Respondent contends that petitioner's claim directed to the trial court's failure to instruct the jury on the lesser-included offense of attempted voluntary manslaughter is barred by *Teague v. Lane*, 489 U.S. 288 (1989).  Where the state properly raises a *Teague* argument, the Court generally must address it before reaching the merits of petitioner's claim.  *See Horn v. Banks*, 536 U.S. 266, 267 (2002) (per curiam); *Caspari v. Bohlen*, 510 U.S. 383, 389 (1994); *Butler v. Curry*, 528 F.3d 624, 633 (9th Cir. 2008); *Fields v. Brown*, 503 F.3d 755, 770 (9th Cir. 2007).

In *Teague*, the Supreme Court held that, "new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced."  *See Teague*, 489 U.S. at 310.  Under *Teague*, the new rule will be applied or announced in cases on collateral review only if it falls into one of two exceptions.  *See id.* at 311-13.  To determine whether a habeas petitioner is entitled to the application of a particular rule, the habeas court performs a three-step analysis under *Teague*: (1) the date on which the defendant's conviction became final is determined; (2) the habeas court considers whether the rule is new; and (3) if the rule is new, the court determines whether the rule nonetheless falls within one of the two narrow exceptions to the *Teague* doctrine.  *See O'Dell v. Netherland*, 521 U.S. 151, 156.  "In general . . . a case announces a new rule when

it breaks new ground or imposes a new obligation on the States or the Federal Government." *Teague*, 489 U.S. at 301. Put another way, "a case announces a new rule if the result was not dictated by precedent existing at the time the defendant's conviction became final," *see id.*, or put yet another way, "the unlawfulness of [the] conviction was apparent to all reasonable jurists," *Lambrix v. Singletary*, 520 U.S. 518, 527-28 (1997).

Respondent contends that granting relief for this part of petitioner's instructional error claim would announce a new rule that that was not compelled by existing precedent when petitioner's conviction became final: "a defendant's right to present a defense in a criminal trial includes the right to have the jury instructed on lesser-included offenses." (Answer Mem. at 15.)

The Ninth Circuit explicitly has held that "the failure of a state court to instruct on a lesser offense [in a non-capital case] fails to present a federal constitutional question and will not be considered in a federal habeas corpus proceeding." *Bashor v. Risley*, 730 F.2d 1228, 1240 (9th Cir. 1984) (parenthetical in original); *see also Windham v. Merkle*, 163 F.3d 1092, 1106 (9th Cir.1998) ("Under the law of this circuit, the failure of a state court to instruct on lesser included offenses in a non-capital case does not present a federal constitutional question."). The Ninth Circuit also has held that *Teague* bars application of a rule that the trial court has a duty to instruct on lesser included offenses in a non-capital case. *See Solis v. Garcia*, 219 F.3d 922, 929 (9th Cir. 2000); *see also Turner v. Marshall*, 63 F.3d 807, 819 (9th Cir. 1995) (noting that the Ninth Circuit "has declined to find constitutional error arising from the failure to instruct on a lesser included offense in a noncapital case," and that to hold otherwise would create a new rule in violation of *Teague*), *overruled on other grounds*, *Tolbert v. Page*, 182 F.3d 677 (9th Cir. 1999).

The Ninth Circuit has observed, however, that a "defendant's right to adequate jury instructions on his or her theory of the case might, in some cases,

constitute an exception to the general rule" that the failure of a state trial court to instruct on lesser offenses in a non-capital case does not present a federal constitutional claim. *See Solis*, 219 F.3d at 929; *Bashor*, 730 F.2d at 1240. But to the extent that federal due process requires that a lesser offense instruction be given, such an instruction need only be given when the evidence warrants it. *See Hopper v. Evans*, 456 U.S. 605, 611-12 (1982) (considering the requirement in a capital case); *Miller v. Stagner*, 768 F.2d 1090, 1091 (9th Cir. 1985) (same); *see also Solis*, 219 F.3d at 929 (finding no constitutional error even where the instruction is consistent with the defense theory where "there was not substantial evidence to support [the lesser] charge").

In light of the foregoing authorities, if petitioner's instructional error claim were premised on the trial court's failure to instruct on a lesser included offense where that was the theory of defense and the evidence warranted instruction on the lesser included offense, *Teague* would not be implicated. But the lesser included offense of attempted voluntary manslaughter, based on a theory of self-defense or heat of passion, was not petitioner's theory of defense in this case and was not warranted by the evidence.

Petitioner's theory of defense at trial was that he was an innocent passenger in the backseat of the silver car and had no involvement in the shooting. He presented no evidence at trial that the occupants of the silver car shot at the victims because of self-defense or heat of passion. Although petitioner did attempt to present a theory of self-defense or heat of passion, the trial court prohibited it after reasoning that petitioner's defense was to deny any involvement in the shooting, and that there was no concrete evidence supporting self-defense or heat of passion (but rather only speculation in the form of questions posed by the attorneys). (7 RT 3155-56, 3314-18.) During his closing argument, petitioner's counsel argued that petitioner was not guilty because he was only a passive occupant in the backseat of the silver car. (8 RT 3702-08.)

1   Since petitioner is unable to claim that he was denied an instruction on a
2   lesser included offense that reflected his theory of defense and that was warranted
3   by the evidence, his instructional error claim based on the trial court's failure to
4   give a lesser included offense instruction does not present a federal claim and
5   would arguably contravene *Teague*.  Moreover, petitioner does not argue that any
6   exception to *Teague* would apply here.

7   In sum, this part of petitioner's claim in Ground Three arguably is barred by
8   the *Teague* doctrine.  In any event, as discussed below, this part of the claim also
9   fails on the merits.

11   **2.   Legal standard.**

12   In order to merit federal habeas relief on a claim that the trial court erred by
13   failing to properly instruct a jury, petitioner must allege and then show that the trial
14   court committed an error that so infected the entire trial that the resulting conviction
15   violated his federal constitutional right to due process.  *See Henderson v. Kibbe*,
16   431 U.S. 145, 154 (1977); *Cupp v. Naughten*, 414 U.S. 141, 147 (1973);
17   *Dunckhurst v. Deeds*, 859 F.2d 110, 114 (9th Cir. 1988).  Claims of instructional
18   error may not be judged in artificial isolation, but must be considered in the context
19   of the trial record and the instructions as a whole.  *See Estelle*, 502 U.S. at 72;
20   *Boyde v. California*, 494 U.S. 370, 380 (1990); *see also Cupp*, 414 U.S. at 147; *Ho
21   v. Carey*, 332 F.3d 587, 592 (9th Cir. 2003).  In reviewing an ambiguous
22   instruction, the court inquires whether there is a "reasonable likelihood" that the
23   jury has applied the challenged instruction in a way that violates the Constitution.
24   *See Estelle*, 502 U.S. at 72 and n.4.

25   The omission of an instruction is less likely to be prejudicial than a
26   misstatement of the law.  *See Walker v. Endell*, 850 F.2d 470, 475-76 (9th Cir.
27   1987) (*citing Kibbe*, 431 U.S. at 155).  Thus, a habeas petitioner whose claim
28   involves a failure to give a particular instruction bears an "'especially heavy

burden.'"   *Villafuerte v. Stewart*, 111 F.3d 616, 624 (9th Cir. 1997); *see also*
*Hendricks v. Vasquez*, 974 F.2d 1099, 1106 (9th Cir. 1992).

### 3.   Analysis.

#### a.   self-defense instruction.

The California Court of Appeal set out the requirements of self-defense and concluded that a corresponding instruction was not warranted by the evidence (Lodgment 8 at 15-16):

> A defendant acts in self-defense when he or she reasonably believes that killing is necessary to avert an imminent threat of death or great bodily injury.  Self-defense is a complete defense to the crime of murder or attempted murder.  (*People v. Elmore* (2014) 59 Cal.4th 121, 133–135.)   The defense of self-defense is not available to a defendant who provokes an altercation unless the defendant makes a good faith attempt to withdraw from the altercation and communicates such intent to the victim.  (*People v. Hernandez* (2003) 111 Cal. App. 4th 582, 588–589; *People v. Watie* (2002) 100 Cal. App. 4th 866, 877.) Imperfect self-defense is the killing of another human being under the actual but unreasonable belief that the killer was in imminent danger of death or great bodily injury.  (*People v. Booker* (2011) 51 Cal. 4th 141, 182.)

> Here, there is no evidence that defendants feared any imminent threat of death or great bodily injury.  Robles shouted and gesticulated at the officers, and defendants pursued the officers first on foot and then in a vehicle.  The defendants were the aggressors.  The officers fled as defendants pursued them.  There is no evidence that the officers by their appearance or their actions threatened violence in any manner. The fact that Wences fired three times while only one shot was fired

from the silver car does not suggest that defendants acted in self-defense because there is no evidence that Wences was the first to point a gun at the other car.

Moreover, the evidence shows that defendants provoked the altercation, and there is no evidence that they attempted to withdraw from the altercation or communicated such an intent to the officers. Contrary to defendants' argument, the fact that they did not follow the Camaro through the red light at Cesar Chavez Avenue but instead turned right and quickly turned back onto State Street does not suggest that they abandoned the pursuit.  We conclude that the defendants were not entitled to an instruction on self-defense or imperfect self-defense.

At the outset, the California Court of Appeal's determination that, as a matter of state law, the evidence did not warrant an instruction on self-defense fails to raise an issue of federal constitutional magnitude.  *See Menendez v. Terhune*, 422 F.3d 1012, 1029 (9th Cir. 2005) ("Any error in the state court's determination of whether state law allowed for an instruction in this case cannot form the basis for federal habeas relief.") (*citing Estelle*, 502 U.S. at 67-68); *see also Miller*, 757 F.2d at 993 (where the petitioner's entitlement to a requested instruction depended upon state law, the trial court's failure to give it did not amount to a federal constitutional violation); *Walker*, 850 F.2d at 476 (failure give an instruction defining an element of the offense was at most an error of state law).  "Quite simply, that should be the final word on the subject." *Menendez*, 422 F.3d at 1029.

In any event, in order to raise a claim that is cognizable on federal habeas review, petitioner must show that the omitted instruction so infected the entire trial that the resulting conviction violated her right to due process.  *See Henderson*, 431 U.S. at 154.  "In addition, a state trial court's finding that the evidence does not support [the instruction] is entitled to a presumption of correctness on federal

habeas review." *Menendez*, 422 F.3d at 1029 (*citing Hartman v. Summers*, 120 F.3d 157, 161 (9th Cir. 1997)).

Petitioner has not made these showings with respect to an instruction on self-defense. As the Court of Appeal found, the record was devoid of any evidence that petitioner feared an imminent threat of death or great bodily injury, and in particular, no evidence suggested that the Officer Wences pointed his gun first. Nor did any evidence reflect that petitioner and Robles, who were the aggressors, attempted to withdraw from the altercation and communicated such an intent to the officers.

Petitioner contends that he was entitled to a self-defense instruction because of multiple types of trial evidence, but none of it overcomes the presumption of correctness afforded to the California Court of Appeal's determination that the instruction was unwarranted. (Reply at 18-19.) First, although petitioner argues that his membership in a gang automatically led him to believe that the encounter was a potentially violent gang confrontation that required self-defense, the trial court aptly rejected this argument by commenting that it was speculative and would mean that gang members are always acting in self-defense any time they pull out a gun. (7 RT 3315.) Second, although petitioner argues that Officer Wences's aggressive driving could have caused the occupants of the silver car to fear for their lives, the only reasonable conclusion to draw from the evidence of Officer Wences's driving is that he was trying to get away from the silver car, given that Robles was pursuing the officers with a gun and had not communicated any intent to withdraw. Third, although petitioner argues that Alex Miranda shot the officers' fender in order to disable the Camaro without hurting anyone, this theory also is speculative and unsupported by any trial testimony.

In sum, the Court of Appeal's decision "was not error, let alone a violation of due process." *See Menendez*, 422 F.3d at 1030 (rejecting federal due process claim premised on failure to give a defense instruction on imperfect self-defense where

the evidence did not support the theory); *Hartman*, 120 F.3d at 161 (same). Accordingly, the Court of Appeal's rejection of this claim did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, nor did it result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

### b.     instruction on attempted voluntary manslaughter.

The California Court of Appeal set out the elements of attempted voluntary manslaughter and concluded that a corresponding instruction was not warranted by the evidence (Lodgment 8 at 16):

> An intentional homicide is voluntary manslaughter if the defendant kills in the heat of passion in circumstances sufficient to provoke an ordinarily reasonable person to act rashly and without deliberation (heat of passion). (*People v. Elmore*, *supra*, 59 Cal. 4th at pp. 133–134; *People v. Enraca* (2012) 53 Cal. 4th 735, 739.)  A defendant who provokes an altercation that results in a homicide cannot reduce the crime to voluntary manslaughter unless he makes a good faith attempt to withdraw from the altercation and communicates such intent to the victim. (*People v. Oropeza*, *supra*, 151 Cal. App. 4th at p. 93; *see People v. Hill* (2005) 131 Cal. App. 4th 1089, 1102–1103, *disapproved on another ground in People v. French* (2008) 43 Cal. 4th 36, 48, fn. 5.)
>
> Again, there is no evidence that defendants believed, reasonably or unreasonably, that they faced an imminent threat of death or great bodily injury.  The officers' actions did not convey a threat of violence, and there is no evidence that Wences was the first to point a gun at the other car.  Moreover, defendants provoked the altercation by

1    chasing the officers, and there is no evidence that they attempted to

2    withdraw.  We therefore conclude that defendants were not entitled to

3    a voluntary manslaughter instruction.

4        For the same reasons discussed above with respect to petitioner's other claim

5    of instructional error, this claim depends on a determination of state law and

6    therefore fails to raise an issue of federal constitutional magnitude.  *See Menendez*,

7    422 F.3d at 1029; *Miller*, 757 F.2d at 993; *Walker*, 850 F.2d at 476.  And in any

8    event, the record did not support an instruction on attempted voluntary

9    manslaughter, because the record did not show that petitioner feared an imminent

10   threat of death or great bodily injury, nor did it show an attempt to withdraw and

11   communication of that intent to the officers.  The California Court of Appeal's

12   determination was not error, let alone a violation of due process.  *See Menendez*,

13   422 F.3d at 1030; *Hartman*, 120 F.3d at 161.  And although petitioner again

14   contends that he had a fear of great bodily harm — because, as a gang member, he

15   would have believed the encounter was a confrontation with rival gang members —

16   this contention is only hypothetical and unsupported by any specific evidence of

17   actual fear.

18       Accordingly, the Court of Appeal's rejection of this claim did not result in a

19   decision that was contrary to, or involved an unreasonable application of, clearly

20   established federal law, nor did it result in a decision that was based on an

21   unreasonable determination of the facts in light of the evidence presented in the

22   state court proceeding.

23

24   **D.    Habeas relief is not warranted with respect to petitioner's sentencing-**

25   **error claims (Grounds Four and Five).**

26       In Grounds Four and Five, petitioner claims that the trial court violated his

27   due process rights by imposing a minimum parole eligibility term of 15 years

28   (rather than 7 years) for each of the attempted murders, and by misunderstanding its

sentencing discretion in this regard.  (FAP at 6; FAP Attachment A at 4; Reply at 25-28.)

Federal habeas relief only is available if the petitioner is contending that he is in custody in violation of the Constitution or laws or treaties of the United States. *See* 28 U.S.C. § 2254(a); *see also Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991). Petitioner's claims in Ground Four and Five concern only matters of state sentencing law and therefore do not present cognizable federal habeas claims.  *See Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) (rejecting petitioner's claim that a state court misapplied its own aggravating circumstance because "federal habeas corpus relief does not lie for errors of state law"); *see also Brown v. Mayle*, 283 F.3d 1019, 1040 (9th Cir. 2002) (rejecting as noncognizable claim that trial court had failed to exercise its sentencing discretion under *Romero*), *judgment vacated on other grounds*, 538 U.S. 901 (2003); *Watts v. Bonneville*, 879 F.2d 685, 687 (9th Cir. 1989) (holding that sentencing error claim under California Penal Code § 654 is not cognizable on federal habeas review); *Miller v. Vasquez*, 868 F.2d 1116, 1118-19 (9th Cir. 1989) (holding that claim that offense did not qualify as a "serious felony" for purposes of California's sentence enhancement provisions is not cognizable on federal habeas review); *Sturm v. California Adult Authority*, 395 F.2d 446, 448 (9th Cir. 1967) (observing that "a state court's interpretation of its [sentencing] statute does not raise a federal question").

Moreover, the California Court of Appeal determined that petitioner's argument regarding his minimum parole eligibility term was incorrect as a matter of California sentencing law.  (Lodgment 8 at 21-22.)  The Court is bound by that determination.  *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (per curiam) (a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court on habeas review); *see also Peltier v. Wright*, 15 F.3d 860, 862 (9th Cir. 1994) (a federal habeas court is bound by a state court's interpretation of state laws relating to sentencing); *Aponte v. Gomez*,

1   993 F.2d 705, 707 (9th Cir. 1993) (same).

2      In sum, habeas relief is unavailable for petitioner's claims of sentencing error

3   in Grounds Four and Five.

4

5   **E.    Habeas relief is not warranted with respect to petitioner's Eighth**

6         **Amendment claim (Ground Six).**

7      In Ground Six, petitioner claims that his sentence of life with the possibility

8   of parole after 30 years constitutes cruel and unusual punishment.   (FAP

9   Attachment A at 5; Reply at 28-33.)

10      "The Eighth Amendment, which forbids cruel and unusual punishments,

11   contains a 'narrow proportionality principle' that 'applies to noncapital sentences.'"

12   *Ewing v. California*, 538 U.S. 11, 20 (2003) (*quoting Harmelin v. Michigan*, 501

13   U.S. 957, 996-97 (1991) (Kennedy, J., concurring)).   This requires a reviewing

14   court to compare the gravity of the offense to the harshness of the penalty.   *See*

15   *Ewing*, 538 U.S. at 28.

16      Petitioner aided and abetted a shooting directed at two plainclothes police

17   officers.  He followed the victims' car on foot and then entered another car with his

18   co-defendant — who was visibly carrying a gun and was belligerent toward the

19   victims — in order to continue a pursuit of the victims that led to the shooting.  And

20   after the shooting, petitioner fled the scene with a gun that was consistent with the

21   gun used in the shooting.  In other words, as the Court of Appeal found, petitioner

22   "intended to kill the two officers by giving aid and encouragement toward that

23   end."  (Lodgment 8 at 23.)

24      Petitioner's sentence of life with the possibility of parole after 30 years did

25   not raise an inference of gross disproportionality because his offenses were

26   potentially fatal and committed against persons.  *See Solem v. Helm*, 463 U.S. 277,

27   292-93 (1983) ("[A]s the criminal laws make clear, nonviolent crimes are less

28   serious than crimes marked by violence or the threat of violence."); *Norris v.*

*Morgan*, 622 F.3d 1276, 1293 (9th Cir. 2010) (noting that no court "has found a defendant's term-of-years sentence for a non-homicide crime *against a person* to be grossly disproportionate to his or her crime") (emphasis in original); *Cocio v. Bramlett*, 872 F.2d 889, 892 (9th Cir. 1989) ("The type of harm is measured by whether the crime was violent in nature and whether the offense was directed at a person or at property.").

Although petitioner points out that he was only an aider and abettor, this makes no legal difference.  Generally, a person who aids and abets is legally responsible for an act as if he committed it directly.  *See Nye & Nissen v. United States*, 336 U.S. 613, 618-19 (1949).  The fact that petitioner did not shoot the gun himself did not render his sentence unconstitutional.  *See Solem*, 463 U.S. at 290 n.15 (noting that "clearly no sentence of imprisonment would be disproportionate" for a defendant who had aided and abetted a felony that resulted in murder) (*describing Enmund v. Florida*, 458 U.S. 782 (1982), a case involving a petitioner who acted as a getaway driver for a robbery but had no intent to kill); *see also Windham v. Merkle*, 163 F.3d 1092, 1106 (9th Cir. 1998) (rejecting Eighth Amendment challenge brought by petitioner who was convicted of murder under an aiding and abetting theory but received a sentence that a direct perpetrator would receive).

In sum, the California Court of Appeal's rejection of this claim did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law.

## RECOMMENDATION

IT THEREFORE IS RECOMMENDED that the District Court issue an Order: (1) approving and accepting this Final Report and Recommendation; and

///

///

(2) directing that Judgment be entered denying the First Amended Petition and dismissing this action with prejudice.

DATED:  October 12, 2016

_____
ALEXANDER F. MacKINNON
UNITED STATES MAGISTRATE JUDGE